FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

04 MAY 17 PM 3:29

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BETH BREWER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 03-PT-0559-M |
| ) | |
| CONTINENTAL CASUALTY ) | |
| COMPANY; TOM MCLEOD ) | |
| SOFTWARE CORPORATION GROUP ) | |
| DISABILITY PLAN, ) | |
| ) | |
| Defendants. ) | |

ENTERED
MAY 17 2004

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

Facts and Procedural History
Prior to Trial[1]

Beth Brewer (Brewer) worked for the Tom McLeod Software Corporation. Brewer was covered under the Plan, which was a group long term disability contract of insurance. Continental is the insurer, and it alone determines eligibility and benefits under the terms of the Plan. *See* MSJ Def. Ex. 1 at ¶ 2. Tom McLeod Software Corporation has no input in the decision-making process and it does not bear the risk of loss under the Plan. Continental bears all the risk under the Plan. *See* MSJ Def. Ex. 2 at ¶ 4.

The Plan defines Total Disability as follows:

"Disability" means that during the Elimination Period [90 days] and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

---

[1] Prior to the trial, the parties agreed that these factual representations are substantially correct.

40

> (1) continuously unable to perform the Material and Substantial duties of Your Regular Occupation; and
>
> (2) not working for wages in any occupation for which You are or become qualified for by education, training or experience.

*See* MSJ Def. Ex. 1 at ¶ 3.[2] Here, the Elimination Period began on April 11, 2001 and ended on July 9, 2001. The Own Occupation period began on July 10, 2001 and would have run until July 10, 2003. After this period, Brewer would have been required to show that she was unable to engage in any occupation. *See* MSJ Def. Ex. 1 at ¶ 5.

On May 21, 2001, Brewer submitted an application for long term disability benefits based on an alleged total disability due to a back condition. Brewer has undergone surgery for lumbar laminectomy, bilateral fasciectomies, complete decompressive discectomy, posterior lumbar interbody fusion, and Ray cages in her lumbar spine. Brewer contends that she suffers from intractable lumbar and thoracic pain, as well as left lower extremity radiculopathy which has failed to respond to invasive interventions. Along with the application, Brewer submitted the Employer's Statement, Employee's Statement, Physician's Statement, and various other medical records. *See* Claim File at 180-205. Included in the medical records were portions of the records of Brewer's neurosurgeon, Terry M. Andrade, M.D. The Employer's Statement indicated that Brewer's job "Requires the ability to input, review and modify data on computer screens. Requires sitting at a PC terminal, inputting data to PC, some phone calls." *See* Claim File at 181. There was also an attached job description for her position, Support Accounts Manager. *Id.* at 182.

---

[2]This is the "Own Occupation" portion of the Plan. After 24 months, the definition of disability changes to what is called the "Any Occupation" definition. Apparently, Brewer's benefits were terminated before the Own Occupation period ended.

2

On July 2, 2001, Brewer sent additional information to Continental. *See* Claim File at 148-57. This submission included a three page letter outlining her personal views on the claim, and notes summarizing various tests and procedures performed on her. On July 9, 2001, Brewer submitted the first page of a report prepared by Dr. Kenneth Varley summarizing the surgical treatment afforded to Brewer on June 15, 2001. *Id.* at 144-45. On July 23, 2001, Brewer forwarded a complete physician's statement prepared by Dr. Varley. *Id.* at 135-37. Brewer also submitted various other office notes and reports prepared by her physicians in support of her claim. *Id.* at 108-33.[3]

Based on the information submitted, Continental began paying benefits to Brewer on July 10, 2001. On July 19, 2001, Continental made the decision to contact Dr. Andrade, purportedly to clarify some discrepancies between Brewer's claims of pain, etc., and the records submitted by Dr. Andrade. *See* Claim File at 98-99. According to Continental, Dr. Andrade stated that Brewer's primary problem is narcotic addiction. *Id.* at 93. Dr. Andrade further stated that Brewer "is taking the pain beyond reason." *Id.* Dr. Andrade advised Continental that Brewer would be able to return to work on August 13, 2001. *Id.*[4] On or around July 20, 2001, Dr. Varley issued another Physician's Statement stating that he was unable to determine a return to work date at that time. *See* Pl. Ex. B.

By letter dated August 14, 2001, Continental informed Brewer that her benefits would be discontinued based on information obtained from one of her treating physicians that she was capable of performing the material and substantial duties of her regular occupation. *See* Claim

---

[3]The various physician reports speak for themselves.

[4]Dr. Andrade does not recall any such contact.

File at 105-07. The letter informed Brewer of the conversation that Continental had with Dr. Andrade, and of her right to appeal and submit additional information. *Id. See also* MSJ Def. Br. at 8-9. On the same day Continental sent a letter to Brewer's former employer advising it of the decision to discontinue benefits. *See* Claim File at 104; MSJ Def. Br. at 9-10.

On September 13, 2001, Brewer sent a request for reconsideration of the decision, explaining her condition and why Dr. Andrade's opinion was incorrect. *See* Claim File at 69-74. On September 14, 2001, Continental received additional correspondence from Brewer again requesting reconsideration and providing further medical information regarding her condition. *Id.* at 85. On or around September 25, 2001, Brewer's other treating physician, orthopedic specialist Alex Mompoint, M.D., submitted a response to Continental's functional assessment request. *See* Pl. Ex. C. Dr. Mompoint stated that Brewer was currently unable to perform the duties of her job. *Id.* Continental's internal Claim Activity report indicates that it received the evaluation of Dr. Mompoint. *See* Pl. Ex. E. On September 26, 2001, Continental sent a letter confirming that the claim had been appealed and advising Brewer about some of the details of the review process. *See* Claim File at 61-63.

On September 27, 2001, Continental sent Brewer a letter indicating that the additional information submitted by her, consisting in part of additional medical reports from a Dr. Potnis, did not indicate that she would be unable to perform the material and substantial duties of her job. *See* Claim File at 58. The letter informed Brewer again that her benefits would be discontinued as of August 12, 2001. The letter also stated that her claim file would be forwarded to the Appeals Committee for a formal review. *Id.* Brewer notes that the Disability Specialist was not a licensed medical doctor, and that apparently he spent only 15 minutes reviewing the

4

file. *See* Pl. Ex. E.

The Appeals Committee, after conducting its review, determined that a final decision could not be made at that time and that additional information was needed. *See* Claim File at 46. On October 26, 2001, Continental sent Brewer a letter, informing her that her physicians and employer would be contacted for additional information, and that her file would be sent back to the Disability Specialist for the initial review after the additional information was received. *Id.* On November 3, 2001, Continental sent a Physical Demands Analysis ("PDA") to Brewer's former employer in order to obtain information about her position. *Id.* at 42-44. On November 8, 2001, Brewer's employer returned the PDA. *Id.* at 37-38. The PDA indicated that Brewer's occupation only requires 30 minutes of standing and walking at one time and four hours of sitting. *Id.* It also indicated that she would be allowed to alternate between sitting and standing as needed. *Id.* On November 8, 2001, Brewer apparently re-submitted the July 20 statement from Dr. Varley indicating that she is required to alternate between sitting and standing every 15 minutes and is unable to lift more than 20 pounds. *Id.* at 34. Continental contends that these restrictions are feasible under the PDA. On or around November 7, 2001, Dr. Varley also sent a letter to Continental indicating that Brewer was unable to return to work. *See* Pl. Ex. D.

On November 13, 2001, the Disability Specialist sent a letter to Brewer, informing her that, even with the newly submitted information, her benefits would be terminated. *See* Claim File at 26-27. Brewer's claim file was sent back to the Appeals Committee for another review. The Appeals Committee upheld the termination of benefits, informing Brewer via letter on November 15, 2001. *Id.* at 22-23. The Appeals Committee acknowledged that Brewer's physicians stated that she was unable to work. However, according to the Appeals Committee,

the physicians had not submitted evidence to support this assessment. Brewer was informed that the appeals process was over and that the decision was final. *Id.*

Brewer filed this lawsuit on March 12, 2003. Her complaint, brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), seeks the recovery of past benefits under 29 U.S.C. § 1132(a)(1)(B). She also seeks future benefits, attorney's fees, interest, and costs. *See* Pl. Br. at 17-18. On July 31, 2003, this court denied the parties' cross-motions for summary judgment.

## Facts and Procedural History
## After Trial

The court conducted a trial on November 17, 2003. At the end of the trial, the parties agreed that the court could seek further information from physicians and remand the case to Continental for further review and decision. The reports of those physicians and the decision of Continental dated April 2, 2004 have been filed by the court.

## LEGAL ISSUES

If the relevant plan document gives discretionary authority to the administrator to determine eligibility or to construe the terms of the plan, judicial review of the administrative decision is confined to evidence before the administrator. *See Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)(citing *Brown v. Retirement Committee of Brigg & Stratton Retirement Plan*, 797 F.2d 521, 531 (7th Cir. 1986)(noting a federal court is to focus on the evidence before the administrator at the time of the final decision and is not to hold a *de novo* factual hearing)). Here, the Plan document gives Continental the authority to determine eligibility for benefits, to calculate the amount of benefits, and to construe the terms of

the plan.

Eleventh Circuit cases hold similar plan language confers such discretionary authority. *See Lee v. Blue Cross and Blue Shield of Ala.*, 10 F.3d 1547, 1550 (11th Cir. 1994); *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989); *Anderson v. Blue Cross and Blue Shield of Ala.*, 907 F.2d 1072, 1076 (finding discretionary authority where plan language gave administrator "the right to determine which services and supplies are medically necessary and, therefore, payable and to determine the amount to be paid as a 'reasonable and customary fee' to physicians performing a service to or a procedure on a member").

In *Jett*, the Eleventh Circuit stated: "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, <u>based upon the facts as known to the administrator at the time the decision was made</u>." *Jett*, 890 F.2d at 1139 (emphasis added)(citing *Brown*, 797 F.2d 531). *See also Buckley v. Metropolitan Life*, 115 F.3d 936 (11th Cir. 1997); *Anderson*, 907 F.2d at 1075-76. "As long as a reasonable basis appears for [the administrator's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." *Jett* at 1140; *see also Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1564 (11th Cir. 1990)(determining that denial of plan benefits by a disinterested plan fiduciary under the arbitrary and capricious standard can be reversed only if denial is completely unreasonable).

In *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1566-68 (11th Cir. 1990), the Eleventh Circuit stated:

> [A] wrong but apparently reasonable interpretation is arbitrary and

> capricious if it advances the conflict of interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.
>
> . . . .
>
> We emphasize the central theme of our exposition: well-established common law principles of trusts teach that a fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in the application of the standards will be significantly diminished.

The Eleventh Circuit mandates that once the plaintiff has shown a substantial conflict of interest on the fiduciary's part, the burden shifts to the defendant to prove that its interpretation which resulted in the denial was not tainted by self-interest. Even should a defendant meet that burden, a plaintiff may still succeed if she can demonstrate by other measures that the administrator's decision was arbitrary and capricious. If the court finds that the administrator fails to show that its plan interpretation benefits the class of participants and beneficiaries, the interpretation is not entitled to deference. *See HCA Health Servs. of GA, Inc., v. Employers Health Ins. Co*, 240 F.3d 982, 994-95. See *Brown, supra*, at pages 1561-1567 for a full discussion of the highly significant impact of a conflict of interest.

## CONCLUSIONS OF COURT

In its last decision rendered on April 2, 2004, the defendant Continental takes the position that the report from Dr. R. C. Cezayirli dated December 8, 2003 is only "relevant to her current condition and not her capability as of August 13, 2001." What Continental selectively ignores is that the plaintiff's condition and treatment has been a continuum from the date(s) of her initial

difficulty to the present date. The fact that, rather than showing improvement, her condition has continued to degenerate is relevant to whether she was disabled on August 13, 2001.

In *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997), the court quoted with apparent approval the case of *Bucci v. Blue Cross-Blue Shield of Conn.*, 764 F. Supp. 1728, 732 (D. Conn. 1991) "holding that since a defendant's duty to provide benefits 'is a continuing one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against the information available from time to time.'" The court further stated, "The district court did not err in directing that the Plan administrator consider all available evidence. As we stated in *Jett*, 'should [the beneficiary] wish to present additional information that might affect the determination of eligibility for benefits, the proper course would be to remand to [the plan administrator] for a new determination.'" In its brief, Continental has argued that "any medical opinion or records of plaintiff's medical condition after August 13, 2001 cannot be considered" as well as "any evidence as to her condition after August 13, 2001 has no bearing whatsoever as to whether Continental correctly determined that she was no longer disabled as of August 13, 2001 ... ." This court disagrees. For this reason, *inter alia*, Continental's decision was wrong. There is no evidence that plaintiff suffered some additional trauma or injury after August 13, 2001; only that her condition continued to degenerate.

This court concludes that Continental elected to determine as "irrelevant" any information, including that provided by Dr. Cezayirli, which did not comport with its earlier decision. Furthermore, the court is of the opinion that Continental has been selective, to its own advantage, with regard to the consideration of other evidence before it. It has acknowledged that Dr. Varley, on July 20, 2001, opined that the plaintiff was unable to sit, stand, or walk for greater

than 10-15 minutes and has been unable to bend at the waist or lift more than 20 pounds or stoop. Continental's answer to this was simply that she "was allowed to stand as needed or change her position." The court is of the opinion that these selective decisions were the result of Continental's conflict of interest.[5] The decision to deny continuing payments was wrong.

There has been some emphasis placed on plaintiff taking pain-killing narcotics. While this might be inadvisable, it is also indicative that she does have severe pain. Dr. Cezeyirli describes her condition as "failed back syndrome." This is indicative of her continuing chronic condition.

The court ultimately concludes that:

1. Continental's decision was wrong.

2. Continental has not met its burden of proving that its decision was not tainted by its conflict of interest.

Within ten (10) days, the plaintiff will submit a proposed final judgment. The defendants will have seven (7) days to respond as to form.[6]

This the 17 day of May, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[5] It gave little, if any, consideration to Dr. Mompoint's report and opinion.

[6] The defendant has recently submitted the case of *Hooper v. Albany International, et al*, an unpublished case decided by the 11th Circuit on November 25, 2003. This court notes that the *Hooper* court noted, in footnote 1: "There is no evidence that a conflict of interest exists..."